# EXHIBIT A

| Office Action Summary | Application No. 16/851,197 | Applicant(s) Das et al. | |
|---|---|---|---|
| | Examiner JUE ZHANG | Art Unit 2838 | AIA (FITF) Status Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE 3 MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☑ Responsive to communication(s) filed on 12/06/2022.
☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☐ This action is **FINAL.** 2b) ☑ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s) 1-22 is/are pending in the application.
5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☑ Claim(s) 1-5 and 8-22 is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☑ Claim(s) 6-7 are subject to restriction and/or election requirement

* If any claims have been determined allowable, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☑ The drawing(s) filed on 02/07/2020 is/are: a)☑ accepted or b)☐ objected to by the Examiner.
Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
**Certified copies:**
a)☐ All b)☐ Some** c)☐ None of the:
1.☐ Certified copies of the priority documents have been received.
2.☐ Certified copies of the priority documents have been received in Application No. _____.
3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)
2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date ______.
3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date ______.
4) ☐ Other: ______.

## DETAILED ACTION

1. This office action is in response to the election filed on 12/13/2022. Claims 1-22 are pending, of which claims 6-7 are withdrawn as non-elected invention.

### *Notice of Pre-AIA or AIA Status*

2. The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA.

### *Election/Restrictions*

3. Applicant's election without traverse of claims 1-5, 8-22 reading on Species II in the reply filed on 12/13/2022 is acknowledged.

### *Priority*

4. Applicant's claim for the benefit of a prior-filed application under 35 U.S.C. 119(e) or under 35 U.S.C. 120, 121, or 365(c) is acknowledged.

### *Drawing*

5. The drawing submitted on 04/17/2020 is acknowledged and accepted by the examiner.

### *Information Disclosure Statement*

6. The information disclosure statements (IDS) submitted on 05/17/2020 has been considered by the examiner.

### *Claim Rejections - 35 USC § 102*

7. The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (a)(1) the claimed invention was patented, described in a printed publication, or in public use, on sale or otherwise available to the public before the effective filing date of the claimed invention.

(a)(2) the claimed invention was described in a patent issued under section 151, or in an application for patent published or deemed published under section 122(b), in which the patent or application, as the case may be, names another inventor and was effectively filed before the effective filing date of the claimed invention.

8. Claims 1-2, 5, 15-16 are rejected under 35 U.S.C. 102(a)(1) and/or (a)(2) as being anticipated by OTAKE et al. (US Patent or PG Pub. No. 20160308523, hereinafter '523).

Claim 1, '523 teaches a power converter module (e.g., 2, see [0261], Claims 1-24, Fig. 1-32) comprising:

a housing (e.g., the packaging/housing containing the module, see [0177], Fig. 16-19);

a substrate within the housing, the substrate comprising a base layer (e.g., 10) and a conductive layer (e.g., 10a/12) on a surface of the base layer (e.g., see Fig. 28-30); and

power converter circuitry (e.g., 1 of 2, see Fig. 28-30) on the substrate and comprising at least two silicon carbide switching components (e.g., Q1/Ds1, Q4/Ds4) coupled to one another via the conductive layer (e.g., see [0231]-[0236]);

wherein the power converter module is devoid (completely without) of a baseplate (e.g., no baseplate in 2, see Claims 1-24, Fig. 28-30).

Claim 2, '523 teaches the limitations of claim 1 as discussed above. It further teaches that wherein the substrate comprises a direct bonded copper substrate (e.g., 10a bonded on 10 directly, see [0237]-[0239], Fig. 30).

Claim 5, '523 teaches the limitations of claim 1 as discussed above. It further teaches that wherein the power converter circuitry is one of a buck converter, a half-

bridge converter (e.g., the half bridge converter circuit, see Fig. 29), a full-bridge converter, a single-phase inverter, and a three-phase inverter.

Claim 15, '523 teaches a power converter module (e.g., 2, see [0261], Claims 1-24, Fig. 1-32) comprising:

a housing (e.g., the packaging/housing containing the module, see [0177], Fig. 16-19);

a substrate comprising a base layer (e.g., 10), a first conductive layer (e.g., 10a/12) on a first surface of the base layer, and a second conductive layer (e.g., 10b) on a second surface of the base layer opposite the first surface (e.g., see Fig. 28-30); and

power converter circuitry (e.g., 1 of 2, see Fig. 28-30) on the substrate and comprising at least two silicon carbide switching components (e.g., Q1/Ds1, Q4/Ds4) coupled to one another via the first conductive layer, the at least two silicon carbide switching components forming a plurality of channels (e.g., the separation between Q1 and Q4 on 2), and each channel of the plurality of channels comprises at least one silicon carbide transistor (e.g., the SIC MISFET); wherein the power converter module is devoid of a baseplate (e.g., no baseplate in 2, see Claims 1-24, Fig. 28-30).

Claim 16, '523 teaches the limitations of claim 15 as discussed above. It further teaches that wherein each channel of the plurality of channels further comprises at least one silicon carbide diode that is coupled in series with the at least one silicon carbide transistor (e.g., the SiC based SBD Ds1 in series with Q4, Ds4 in series with Q1, see Fig. 29).

***Claim Rejections - 35 USC § 103***

9. The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made.

10. The factual inquiries set forth in Graham v. John Deere Co., 383 U.S. 1,148 USPQ 459 (1966), that are applied for establishing a background for determining obviousness under 35 U.S.C. 103(a) are summarized as follows:

1. Determining the scope and contents of the prior art.
2. Ascertaining the differences between the prior art and the claims at issue.
3. Resolving the level of ordinary skill in the pertinent art.
4. Considering objective evidence present in the application indicating obviousness or nonobviousness.

11. This application currently names joint inventors. In considering patentability of the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

12. Claim 3 is rejected under 35 U.S.C. 103(a) as being unpatentable over OTAKE et al. (US Patent or PG Pub. No. 20160308523, hereinafter ‘523), in view of Malhan et al. (US Patent or PG Pub. No. 20080054439, hereinafter ‘439)

Claim 3, ‘523 teaches the limitations of claim 2 as discussed above. ‘523 does not explicitly disclose that wherein the base layer of the direct bonded copper substrate comprises aluminum nitride or silicon nitride.

‘439 discloses a power converter module having the base layer of its direct bonded copper substrate (e.g., 110) comprises aluminum nitride (e.g., aluminum nitride, silicon nitride in 77, see [0063][0119]).

Therefore, it would have been obvious to one having ordinary skill in the art at the time of invention was made to modify the converter module to include the tdirect bonded copper substrate as disclosed in ‘439, because it improves reliability and heat radiation performance (e.g., see [0009]).

13. Claim 4 is rejected under 35 U.S.C. 103(a) as being unpatentable over OTAKE et al. (US Patent or PG Pub. No. 20160308523, hereinafter ‘523), in view of Stevanovic et al. (US Patent or PG Pub. No. 20060108684, hereinafter ‘684).

Claim 4, ‘523 teaches the limitations of claim 1 as discussed above. ‘523 does not explicitly disclose that wherein the substrate comprises an active metal braze substrate.

‘684 discloses a power converter module wherein the substrate (e.g., 12) comprises an active metal braze substrate (e.g., see [0032], Fig. 1-2).

Therefore, it would have been obvious to one having ordinary skill in the art at the time of invention was made to modify the converter module to include the active metal braze substrate as disclosed in ‘684, because it provides thermal and mechanical stability (e.g., see [0032]).

14. Claims 8-14, 17-22 are rejected under 35 U.S.C. 102(a)(1) and/or (a)(2) as being anticipated by OTAKE et al. (US Patent or PG Pub. No. 20160308523, hereinafter '523), in view of Wang et al. (NPL_IEEE 10-kV SiC MOSFET-Based Boost Converter, hereinafter Wang).

Claim 8, '523 teaches the limitations of claim 16 as discussed above. '523 further teaches that wherein the at least one silicon carbide diode comprises at least one silicon carbide Schottky diode (e.g., see [0235], Fig. 28-29).

'523 does not explicitly disclose that wherein the power converter circuitry is a boost converter configured to receive a direct current (DC) input voltage and provide a stepped-up DC output voltage.

Wang discloses a SiC MOSFET-Based Boost Converter configured to receive a direct current (DC) input voltage (e.g., Input DC) and provide a stepped-up DC output voltage (e.g., the voltage across Rload, see Fig. 9) which is attractive for high-frequency and high-voltage power-conversion applications (e.g., see Abstract).

Therefore, it would have been obvious to one having ordinary skill in the art at the time of invention was made to modify the converter module to include the SiC MOSFET as disclosed in Wang, because it is attractive for high-frequency and high-voltage power-conversion applications (e.g., see Abstract).

Claim 9, the combination of '523 and Wang teaches the limitations of claim 8 as discussed above. '523 does not explicitly disclose that wherein the power converter circuitry comprises at least one silicon carbide metal-oxide-semiconductor field- effect transistor (MOSFET) coupled in series with at least one silicon carbide Schottky diode.

Wang further disclose that wherein the power converter circuitry comprises at least one silicon carbide metal-oxide-semiconductor field- effect transistor (MOSFET) coupled in series with at least one silicon carbide Schottky diode (e.g., the SiC JBS diode, see Fig. 9). Wang reads the same obviousness as discussed in claim 8 rejection above.

Claim 10, the combination of ‘523 and Wang teaches the limitations of claim 9 as discussed above. ‘523 does not explicitly disclose that wherein the at least one silicon carbide Schottky diode is coupled between a drain contact of the at least one silicon carbide MOSFET and a first load output of the power converter circuitry, and a source contact of the at least one silicon carbide MOSFET is coupled to a second load output of the power converter circuitry.

Wang further disclose that wherein the at least one silicon carbide Schottky diode is coupled between a drain contact of the at least one silicon carbide MOSFET and a first load output of the power converter circuitry (e.g., the output connecting with Rload, SiC JBS Diod, and Cc), and a source contact of the at least one silicon carbide MOSFET is coupled to a second load output (e.g., the output connecting with Rload and GND) of the power converter circuitry (e.g., see Fig. 9). Wang reads the same obviousness as discussed in claim 8 rejection above.

Claim 11, the combination of ‘523 and Wang teaches the limitations of claim 10 as discussed above. ‘523 further disclose that comprising an inner-loop capacitor (e.g., (e.g., Cs1, Cs4) provided on the substrate and coupled between a cathode of the at least one silicon carbide Schottky diode and the source contact of the at least one silicon carbide MOSFET (e.g., see [0235], Fig. 28-29).

Claim 12, the combination of '523 and Wang teaches the limitations of claim 10 as discussed above. '523 further disclose that comprising snubber circuitry (e.g., the circuits comprising Cs1, Ds1, Cs4, Ds4, Rs4) coupled between a cathode of the at least one silicon carbide Schottky diode and the source contact of the at least one silicon carbide MOSFET (e.g., see Fig. 28-29).

Claim 13, the combination of '523 and Wang teaches the limitations of claim 12 as discussed above. '523 further disclose that wherein the snubber circuitry comprises a resistor (e.g., the circuits comprising Rs4) coupled between the first load output and the second load output (e.g., Rs4 coupled between D4/S1 and S4 through Ds4 and Cs4 respectively, see Fig. 28-29).

Claim 14, the combination of '523 and Wang teaches the limitations of claim 13 as discussed above. '523 further disclose that wherein the snubber circuitry comprises a capacitor (e.g., Cs4) coupled in series with the resistor between the first load output and the second load output (e.g., see Fig. 28-29).

Claim 17, '523 teaches the limitations of claim 16 as discussed above. '523 further teaches that wherein the at least one silicon carbide diode comprises at least one silicon carbide Schottky diode (e.g., see [0235], Fig. 28-29).

'523 does not explicitly disclose that wherein the at least one silicon carbide transistor comprises at least one silicon carbide metal-oxide- semiconductor field-effect transistor (MOSFET).

Wang discloses a SiC MOSFET-Based Boost Converter (e.g., see Fig. 9) which is attractive for high-frequency and high-voltage power-conversion applications (e.g., see Abstract).

Therefore, it would have been obvious to one having ordinary skill in the art at the time of invention was made to modify the converter module to include the SiC MOSFET as disclosed in Wang, because it is attractive for high-frequency and high-voltage power-conversion applications (e.g., see Abstract).

Claim 18, the combination of ‘523 and Wang teaches the limitations of claim 17 as discussed above. ‘523 further teaches that further comprising an inner-loop capacitor (e.g., Cs1, Cs4) provided on the substrate and coupled between a cathode of the at least one silicon carbide Schottky diode and a source contact of the at least one silicon carbide MOSFET (e.g., see [0235], Fig. 28-29).

Claim 19, the combination of ‘523 and Wang teaches the limitations of claim 17 as discussed above. ‘523 further teaches that wherein the at least one silicon carbide Schottky diode is coupled between a drain contact of the at least one silicon carbide MOSFET and a first load output of the power converter circuitry (e.g., terminals O(D4)(S1), and a source contact of the at least one silicon carbide MOSFET is coupled to a second load output of the power converter circuitry (e.g., terminal N (S4), see Fig. 28-29).

Claim 20, the combination of ‘523 and Wang teaches the limitations of claim 19 as discussed above. ‘523 further teaches that further comprising snubber circuitry (e.g., the circuits comprising Cs1, Ds1, Cs4, Ds4, Rs4) coupled between a cathode of the at least one silicon carbide Schottky diode and the source contact of the at least one silicon carbide MOSFET (e.g., see Fig. 28-29).

Claim 21, the combination of ‘523 and Wang teaches the limitations of claim 20 as discussed above. ‘523 further teaches that wherein the snubber circuitry comprises

a resistor (e.g., the circuits comprising Rs4) coupled between the first load output and the second load output (e.g., Rs4 coupled between D4/S1 and S4 through Ds4 and Cs4 respectively, see Fig. 28-29).

Claim 22, the combination of '523 and Wang teaches the limitations of claim 21 as discussed above. '523 further teaches that wherein the snubber circuitry comprises a capacitor (e.g., Cs4) coupled in series with the resistor between the first load output and the second load output (e.g., see Fig. 28-29).

**Examiner's Note:**

15. In the event the determination of the status of the application as subject to AIA 35 U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the statutory basis for the rejection will not be considered a new ground of rejection if the prior art relied upon, and the rationale supporting the rejection, would be the same under either status.

16. Examiner has cited particular columns and line numbers in the references applied to the claims above for the convenience of the applicant. Although the specified citations are representative of the teachings of the art and are applied to specific limitations within the individual claim, other passages and figures may apply as well. It is respectfully requested from the applicant in preparing responses, to fully consider the references in their entirety as potentially teaching all or part of the claimed invention, as well as the context of the passage as taught by the prior art or disclosed by the Examiner.

17. In the case of amending the claimed invention, Applicant is respectfully requested to indicate the portion(s) of the specification which dictate(s) the structure

relied on for proper interpretation and also to verify and ascertain the metes and bounds of the claimed invention.

***Conclusion***

18. Any inquiry concerning this communication or earlier communications from the examiner should be directed to JUE ZHANG whose telephone number is (571)270-1263. The examiner can normally be reached on M-F: 8:30AM-5:00PM

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Monica Lewis can be reached on 571-272-2838. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/JUE ZHANG/
Primary Examiner, Art Unit 2838

**DOCKET NO.:** 099077.026829 **PATENT**
**Application No.:** 16/851,197
P2461US4
**Office Action Dated: March 14, 2023**

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | |
|---|---|
| **In re Application of:** **WOLFSPEED, INC.** | **Confirmation No.: 3898** |
| **Application No.: 16/851,197** | **Group Art Unit: 2838** |
| **Filing Date: April 17, 2020** | **Examiner: Jue Zhang** |

**For: HIGH SPEED, EFFICIENT SIC POWER MODULE**

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

**REPLY PURSUANT TO 37 CFR § 1.111**

In response to the Official Action dated March 14, 2023, reconsideration is respectfully requested in view of the amendments and/or remarks as indicated below:

☒ **Amendments to the Claims** are reflected in the listing of the claims which begins on page 2 of this paper.

☒ **Remarks** begin on page 6 of this paper.

☒ The Commissioner is hereby authorized to charge any fee deficiency, charge any additional fees, or credit any overpayment of fees, associated with this application in connection with this filing, or any future filing, submitted to the U.S. Patent and Trademark Office during the pendency of this application, to Deposit Account No. 50-2036.

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1. (Original) A power converter module comprising:

a housing;

a substrate within the housing, the substrate comprising a base layer and a conductive layer on a surface of the base layer; and

power converter circuitry on the substrate and comprising at least two silicon carbide switching components coupled to one another via the conductive layer;

wherein the power converter module is devoid of a baseplate.

2. (Original) The power converter module of claim 1, wherein the substrate comprises a direct bonded copper substrate.

3. (Original) The power converter module of claim 2, wherein the base layer of the direct bonded copper substrate comprises aluminum nitride or silicon nitride.

4. (Original) The power converter module of claim 1, wherein the substrate comprises an active metal braze substrate.

5. (Original) The power converter module of claim 1, wherein the power converter circuitry is one of a buck converter, a half-bridge converter, a full-bridge converter, a single-phase inverter, and a three-phase inverter.

6. (Withdrawn) The power converter module of claim 1, wherein the power converter circuitry is one of a multilevel topology.

7. (Withdrawn) The power converter module of claim 6, wherein the multilevel topology is one of a neutral point clamped (NPC) and transistor-type neutral point clamped (TNPC).

8. (Original) The power converter module of claim 1, wherein the power converter circuitry is a boost converter configured to receive a direct current (DC) input voltage and provide a stepped-up DC output voltage.

9. (Original) The power converter module of claim 1, wherein the power converter circuitry comprises at least one silicon carbide metal-oxide-semiconductor field-effect transistor (MOSFET) coupled in series with at least one silicon carbide Schottky diode.

10. (Original) The power converter module of claim 9, wherein the at least one silicon carbide Schottky diode is coupled between a drain contact of the at least one silicon carbide MOSFET and a first load output of the power converter circuitry, and a source contact of the at least one silicon carbide MOSFET is coupled to a second load output of the power converter circuitry.

11. (Original) The power converter module of claim 10 further comprising an inner-loop capacitor provided on the substrate and coupled between a cathode of the at least one silicon carbide Schottky diode and the source contact of the at least one silicon carbide MOSFET.

12. (Original) The power converter module of claim 10, further comprising snubber circuitry coupled between a cathode of the at least one silicon carbide Schottky diode and the source contact of the at least one silicon carbide MOSFET.

13. (Original) The power converter module of claim 12, wherein the snubber circuitry comprises a resistor coupled between the first load output and the second load output.

14. (Original) The power converter module of claim 13, wherein the snubber circuitry comprises a capacitor coupled in series with the resistor between the first load output and the second load output.

15. (Original) A power converter module comprising:

a housing;

a substrate comprising a base layer, a first conductive layer on a first surface of the base layer, and a second conductive layer on a second surface of the base layer opposite the first surface; and

power converter circuitry on the substrate and comprising at least two silicon carbide switching components coupled to one another via the first conductive layer, the at least two silicon carbide switching components forming a plurality of channels, and each channel of the plurality of channels comprises at least one silicon carbide transistor;

wherein the power converter module is devoid of a baseplate.

16. (Original) The power converter module of claim 15, wherein each channel of the plurality of channels further comprises at least one silicon carbide diode that is coupled in series with the at least one silicon carbide transistor.

17. (Original) The power converter module of claim 16, wherein the at least one silicon carbide transistor comprises at least one silicon carbide metal-oxide-semiconductor field-effect transistor (MOSFET) and the at least one silicon carbide diode comprises at least one silicon carbide Schottky diode.

18. (Original) The power converter module of claim 17, further comprising an inner-loop capacitor provided on the substrate and coupled between a cathode of the at least one silicon carbide Schottky diode and a source contact of the at least one silicon carbide MOSFET.

19. (Original) The power converter module of claim 17, wherein the at least one silicon carbide Schottky diode is coupled between a drain contact of the at least one silicon carbide MOSFET and a first load output of the power converter circuitry, and a source contact of the at least one silicon carbide MOSFET is coupled to a second load output of the power converter circuitry.

20. (Original) The power converter module of claim 19, further comprising snubber circuitry coupled between a cathode of the at least one silicon carbide Schottky diode and the source contact of the at least one silicon carbide MOSFET.

21. (Original) The power converter module of claim 20, wherein the snubber circuitry comprises a resistor coupled between the first load output and the second load output.

22. (Original) The power converter module of claim 21, wherein the snubber circuitry comprises a capacitor coupled in series with the resistor between the first load output and the second load output.

## REMARKS

The Office Action of March 14, 2023 has been received and its contents carefully noted. Claims 1-22 are currently pending in the application, of which claims 1 and 15 are independent.

### Drawings Acceptance

Applicant notes with appreciation the Examiner's acceptance of the drawings filed February 7, 2020.

### Information Disclosure Statement

Applicant notes with appreciation the Examiner's consideration of the documents cited in the Information Disclosure Statement filed in the present application by the return of the initialed and signed copy of the disclosure form accompanying the Information Disclosure Statement.

### Claim Rejections – 35 U.S.C. § 102

Claims 1, 2, 5, 15, and 16 stand rejected under 35 U.S.C. § 102(a)(1) and/or (a)(2) as being anticipated by U.S. Publication No. 2016/0308523 (hereinafter "OTAKE"). *Office Action*, at 3. This rejection is respectfully traversed.

The disclosure is directed to a high speed, efficient sic power module.

As described in the following paragraph of the printed publication: "[0043] FIG. 8 shows a cross-sectional view of the housing 12 and the substrate 48 through line A-A′ shown in FIG. 7. As shown in FIG. 8, the substrate 48 is mounted in the housing 12 and includes the aluminum nitride base layer 50, the first conductive layer 52 on which the first diode 22 is attached via a die attach material 56 and connected via the wirebonds 54, and a second conductive layer 58."




Figure 8 reproduced with annotations added.

As described in the following paragraph of the printed publication: the "[0040]... substrate provides the necessary strength to the aluminum nitride base layer 50 to make it viable for use in the power converter module 10, which does not include a baseplate to increase the structural integrity thereof as in conventional designs."

OTAKE is directed to power circuit and power module.

OTAKE teaches that "[0238] A copper plate layer 10 a and a copper plate layer 10 b are respectively formed on a front side surface and a back side surface of the ceramic substrate 10. A copper plate layer 14 a and a copper plate layer 14 b are respectively formed also on a front side surface and a back side surface of the signal substrate 14."

FIG. 30




OTAKE Figure 30 reproduced with annotations added.

OTAKE does not teach nor fairly disclose a "power converter module comprising:... a substrate within the housing, the substrate comprising a base layer and a conductive layer on a surface of the base layer; and power converter circuitry on the substrate and comprising at least two silicon carbide switching components coupled to one another via the conductive layer; wherein the power converter module is devoid of a baseplate" as recited by claim 1.

On the contrary, OTAKE does not teach a base layer.

In this regard, the Examiner has alleged that OTAKE teaches a base layer 10. However, OTAKE teaches that reference numeral 10 is a substrate 10. Accordingly, OTAKE does not teach a base layer.

Additionally, OTAKE teaches implementation of a copper plate layer 10 a. Applicant asserts that it appears the copper plate layer 10 a is configured as a baseplate to the substrate 10.

A claim may be properly rejected under 35 U.S.C. § 102 if, and only if, a single prior art reference discloses each and every feature of the invention as recited in the

claim. If the rejected claim recites even one feature that is not disclosed by the prior art reference, the 35 U.S.C. § 102 rejection is improper and must be withdrawn. In this case, the rejection of claim 1 must be withdrawn because OTAKE fails to disclose at least one feature recited in independent claim 1.

For at least this reason, claim 1 is patentably distinct over OTAKE. Claim 15 is allowable for similar reasons. Claims 1, 2, 5, 15, and 16 depend from one of claims 1 and 15 and Applicant asserts that these claims are accordingly allowable as well.

Accordingly, Applicant respectfully requests the indication that claims 1, 2, 5, 15, and 16 are patentable over OTAKE.

Claims 8-14 and 17-22 stand rejected under 35 U.S.C. § 102(a)(1) and/or (a)(2) as being anticipated by OTAKE in view of “IEEE 10-kV SiC MOSFET-Based Boost Converter” (hereinafter “WANG”). *Office Action*, at 7. This rejection is respectfully traversed.

Initially, Applicant notes that the Examiner has indicated that claims 8-14 and 17-22 stand rejected under 35 U.S.C. § 102(a)(1) and/or (a)(2) as being anticipated by <u>two references</u>: OTAKE in view of WANG. Applicant presumes the Examiner is implying that this rejection is an obviousness rejection and not an anticipation rejection.

Applicant requests the Examiner’s confirmation of the same. Moreover, if the Examiner maintains the rejection, Applicant asserts that any such rejection should be non-final.

The rejection of dependent claims 8-14 and 17-22 that includes the added reference of WANG fails to render obvious the claims. In particular, OTAKE as described

above does not render obvious independent claims 1 and 15. Additionally added reference WANG does not cure the deficiencies of OTAKE. Accordingly, the Examiner is respectfully requested to withdraw the rejection under 35 U.S.C. § 103.

**Claim Rejections – 35 U.S.C. § 103**

Claim 3 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over OTAKE in view of U.S. Publication No. 2008/0054439 (hereinafter "MALHAN"). *Office Action*, at 5. This rejection is respectfully traversed.

The rejection of dependent claim 3 that includes the added reference of MALHAN fails to render obvious the claims. In particular, OTAKE as described above does not render obvious independent claims 1 and 15. Additionally added reference MALHAN does not cure the deficiencies of OTAKE. Accordingly, the Examiner is respectfully requested to withdraw the rejection under 35 U.S.C. § 103.

Claim 4 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over OTAKE in view of U.S. Publication No. 2006/0108684 (hereinafter "STEVANOVIC"). *Office Action*, at 6. This rejection is respectfully traversed.

The rejection of dependent claim 4 that includes the added reference of STEVANOVIC fails to render obvious the claims. In particular, OTAKE as described above does not render obvious independent claims 1 and 15. Additionally added reference STEVANOVIC does not cure the deficiencies of OTAKE. Accordingly, the Examiner is respectfully requested to withdraw the rejection under 35 U.S.C. § 103.

## CONCLUSION

Although the present communication may include alterations to the application or claims, or characterizations of claim scope or referenced art, Applicant is not conceding in this application that previously pending claims are unpatentable over the cited references. Rather, any alterations or characterizations are being made to facilitate expeditious prosecution of this application.

In view of the foregoing remarks, Applicant respectfully requests that all the objections and rejections to the claims be removed and that the claims pass to allowance. If, for any reason, the Examiner disagrees, please call the undersigned at 202-861-1516 in an effort to resolve any matter still outstanding before issuing another action. The undersigned is confident that any issue, which might remain can readily be worked out by telephone.

In the event this paper is not timely filed, Applicant petitions for an appropriate extension of time. Please charge any fee deficiencies or credit any overpayments to Deposit Account No. 50-2036 with reference to our Docket No. 099077.026829.

Respectfully submitted,
**BAKER & HOSTETLER LLP**

/John Hilten/

John Hilten
Reg. No. 52,518

Date: June 13, 2023
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304
Telephone: 202-861-1500
Facsimile: 202-861-1783

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NEXUS PHARMACEUTICALS, INC.,<br>Plaintiff,<br>v.<br>EXELA PHARMA SCIENCES, LLC,<br>Defendant. | C.A. No. 22-1233-GBW |

---

**<u>MEMORANDUM ORDER</u>**

Pending before the Court is Defendant Exela Pharma Sciences, LLC's ("Exela") Motion to Dismiss Plaintiff Nexus Pharmaceuticals, Inc.'s ("Nexus") First Amended Complaint for Failure to State a Claim (D.I. 7, the "Motion"). The Motion has been fully briefed and the Court has considered the parties' briefing. D.I. 8; D.I. 13; D.I. 15. Exela requests that the Court dismiss all counts in Nexus' First Amended Complaint (D.I. 5) because Nexus has failed to plausibly allege infringement by Exela. There are two counts in the First Amended Complaint. D.I. 5. Count I alleges that Exela's AKOVAZ prefilled syringe ("PFS") product infringes U.S. Patent No. 11,426,369 ("the '369 patent"), and Count II alleges that Exela's AKOVAZ PFS product infringes U.S. Patent No. 11,464,752 ("the '752 patent"). *Id.* ¶¶ 29-50. For the reasons set forth below, the Court GRANTS Exela's Motion without prejudice.

## I. LEGAL STANDARDS

To state a claim on which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." FED. R. CIV. P. 8(a)(2). Such a claim must plausibly suggest "facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d

Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678). But the Court will "'disregard legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements.'" *Princeton Univ.*, 30 F.4th at 342 (quoting *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016)). Under Rule 12(b)(6), the Court must accept as true all factual allegations in the Complaint and view those facts in the light most favorable to the plaintiff. *See Fed. Trade Comm'n v. AbbVie Inc*, 976 F.3d 327, 351 (3d Cir. 2020).

## II. DISCUSSION

For the reasons explained below, Nexus has failed to satisfy the *Iqbal/Twombly* pleading standard because its allegations are conclusory.[1] Nexus "needs to have pleaded facts that plausibly indicate that Defendant['s] accused products practice each of the limitations asserted in the relevant claims." *DIFF Scale Operation Rsch., LLC v. MaxLinear, Inc.*, C.A. No. 19-2109-LPS-CJB, 2020 WL 2220031, at *1 (D. Del. May 7, 2020), report and recommendation adopted, C.A. No. 19-2109-LPS-CJB, 2020 WL 6867103 (D. Del. Nov. 23, 2020) (citing *Modern Telecom Sys., LLC v. TCL Corp.*, C.A. No. 17-583-LPS-CJB, 2017 WL 6524526, at *2 (D. Del. Dec. 21, 2017); *Raindance Techs., Inc. v. 10x Genomics, Inc.*, C.A. No. 15-152-RGA, 2016 WL 927143, at *2-3 (D. Del. Mar. 4, 2016)). "After all, if after reading a complaint, the Court cannot conclude that it

---

[1] "It is now well established that both direct and indirect infringement claims are subject to the *Twombly/Iqbal* standard." *Shire ViroPharma Inc. v. CSL Behring LLC*, C.A. No. 17-414-MSG, 2019 WL 3546692, at *3 (D. Del. Aug. 5, 2019) (citing *IP Commc'n Sols., LLC v. Viber Media (USA) Inc.*, C.A. No. 16-134-GMS, 2017 WL 1312942, at *2 (D. Del. Apr. 5, 2017); *RAH Color Techs LLC v. Ricoh USA Inc.*, 194 F. Supp. 3d 346, 350-51 (E.D. Pa. 2016)).

is plausible that the accused infringer's product reads on a limitation of an asserted claim of a patent-in-suit, then it cannot be plausible that the accused infringer actually infringes that patent claim." *Id.* (citation omitted).

Nexus contends that Exela infringes "at least claim 1 of the '369 patent." D.I. 5 ¶ 32. Claim 1 of the '369 patent recites:

> 1. A method of making a shelf-stable, ready-to-use ephedrine sulfate composition, the method comprising:
>
> combining ephedrine sulfate, sodium chloride or dextrose, and water to form a batch solution comprising an initial ephedrine sulfate level of 5 mg/mL, 9 mg/mL sodium chloride or 5% dextrose, and no preservative;
>
> optionally contacting the batch solution with an acid or a base to obtain an initial pH level of the solution of 4.5 to 7;
>
> filtering the batch solution through a membrane filter to obtain a filtered batch solution;
>
> sanitizing one or more containers;
>
> placing not more than 20 mL of the filtered batch solution into one of the one or more sanitized containers to obtain one or more filled containers;
>
> sealing each filled container to obtain sealed containers including a shelf-stable, ready-to-use ephedrine sulfate composition; and
>
> maintaining a pH level of the shelf-stable, ready-to-use ephedrine sulfate composition in the sealed containers that is within 0.5 pH units of the initial pH level during storage at 25° C. and 60% relative humidity for at least 12 months or during storage at 40° C. and 75% relative humidity for at least 6 months.

'369 patent, claim 1. With respect to the '369 patent infringement allegations, the First Amended Complaint merely states the following:

> 21. Exela filed a supplemental New Drug Application sNDA No. 208289/S-006 on or about November 10, 2020, seeking FDA approval to market a shelf stable, ready to use prefilled syringe (PFS) composition of ephedrine sulfate with a 5 mg/mL concentration that requires no dilution prior to administration ("Exela's Akovaz PFS Product").

. . .

> 25. The Akovaz PFS Product is a shelf-stable, ready-to-use ephedrine sulfate composition that meets each and every limitation of at least one claim of the '369 patent, either literally or under the doctrine of equivalents.

D.I. 5 ¶¶ 21, 25. The First Amended Complaint "does little more than parrot back the language" of the preamble of claim 1 of the '369 patent and then, in a conclusory manner, states Exela's accused product infringes. *N. Star Innovations, Inc. v. Micron Tech., Inc.*, C.A. No. 17-506-LPS-CJB, 2017 WL 5501489, at *2 (D. Del. Nov. 16, 2017), report and recommendation adopted, C.A. No. 17-506-LPS-CJB, 2018 WL 11182741 (D. Del. Jan. 3, 2018). To plead direct infringement, Nexus must allege facts "that plausibly indicate that the accused products contain each of the limitations found in the claim." *TMI Sols. LLC v. Bath & Body Works Direct, Inc.*, C.A. Nos. 17-965-LPS-CJB, 17-966-LPS-CJB, 17-967-LPS-CJB, 17-968-LPS-CJB, 17-969-LPS-CJB, 2018 WL 4660370, at *9 (D. Del. Sept. 28, 2018) (citations omitted). While Nexus "need not prove its case at the pleading stage," the First Amended Complaint must "place the potential infringer on notice of what activity is being accused of infringement." *Nalco Co. v. Chem–Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018) (internal quotation marks and citation omitted) (cleaned up). Nexus has failed to provide such notice. As Exela argues, the First Amended Complaint is silent "as to any of the steps that Exela performs in the process of making AKOVAZ® PFS, including whether the product is filtered through a membrane, whether one of more containers are sanitized, whether not more than 20 mL of the filtered batch solution is placed into sanitized containers, whether the containers are sealed, and whether a pH level within 0.5 pH units of the initial pH level is maintained 'during storage at 25° C and 60% relative humidity for at least 12 months or during storage at 40° C and 75% relative humidity for at least 6 months.'" D.I. 8 at 6. "In the Court's view, a patentee cannot meet its obligation to assert a plausible claim of infringement under the

*Twombly/Iqbal* standard by merely copying the language of a claim element, and then baldly stating (without more) that an accused product has such an element," as Nexus has done here. *N. Star*, 2017 WL 5501489, at *2.

Nexus' infringement allegations with respect to the '752 patent also parrots back portions of the asserted claims. Nexus contends that Exela infringes "at least claims 1 and 12 of the '752 patent." D.I. 5 ¶ 43. Claim 1 of the '752 patent recites:

> 1. A pharmaceutical product comprising:
>
> a packaged syringe containing a sterilized ready-to-use ephedrine composition comprising:
>
> > a packaged concentration of ephedrine sulfate of 5 mg/mL,
> >
> > 9 mg/mL sodium chloride,
> >
> > no preservative,
> >
> > water, and
> >
> > an initial pH level of about 4.5 to about 7; and
>
> having, after storage in the syringe at 25° C. and 60% relative humidity for 12 months or after storage at 40° C. and 75% relative humidity for 6 months:
>
> > a pH level within 0.5 pH units of the initial pH level,
> >
> > an ephedrine sulfate concentration of at least 95% of the packaged concentration, and
> >
> > a bacterial endotoxin level not more than 7 EU/mg.

'752 patent, claim 1. Claim 12 in the '752 patent depends from claim 10. Claims 10 and 12 recite, respectively:

> 10. A pharmaceutical product comprising:
>
> a packaged ready-to-use single-use container comprising a shelf-stable sterilized pharmaceutical composition comprising:

a packaged concentration of ephedrine sulfate of 5 mg/mL;

9 mg/mL sodium chloride;

water;

no preservative;

an initial pH level of about 4.5 to about 7; and

having, after storage in the single-use container at 25° C. and 60% relative humidity for 12 months or after storage at 40° C. and 75% relative humidity for 6 months:

an ephedrine sulfate concentration of at least 95% of the packaged concentration, and

a pH level within 0.5 pH units of an initial pH level.

12. The pharmaceutical product of claim 10, wherein the pharmaceutical composition is sterilized by terminally sterilizing the pharmaceutical composition in the single-use container.

’752 patent, claims 10 & 12. Again, Nexus’ allegations are conclusory. Nexus’ First Amended Complaint merely states:

> 26. The Akovaz PFS Product is a pharmaceutical product including a packaged syringe containing shelf-stable, sterilized ready to use ephedrine compositions that meets each and every limitation of at least one claim of the ’752 patent, either literally or under the doctrine of equivalents.

D.I. 5 ¶ 26. As Exela correctly notes, the First Amended Complaint “is entirely silent as to AKOVAZ® PFS’s initial pH level, whether it contains sodium chloride or dextrose, the concentration of sodium chloride or dextrose, and whether it contains a preservative, as well as whether, after storage at ‘25° C and 60% relative humidity for at least 12 months’ or storage at ‘40° C and 75% relative humidity for at least 6 months,’ AKOVAZ® PFS would maintain ‘a pH level within 0.5 pH units of the initial pH level,’ ‘an ephedrine sulfate concentration of at least 95% of the packaged concentration,’ or ‘a bacterial endotoxin level not more than 7 EU/mg.’” D.I.

8 at 5-6. Accordingly, Nexus has not met its obligation to assert a plausible claim of infringement for either patent under the *Twombly/Iqbal* standard. "There needs to be *some* facts alleged that articulate *why it is plausible* that the other party's product infringes that patent claim—not just the patentee asserting, in conclusory fashion, that it is so." *N. Star*, 2017 WL 5501489, at *2 (emphasis in original) (citation omitted).[2]

In its Answering Brief, Nexus requests that, if the Court grants Exela's Motion, the "dismissal should be without prejudice and the Court should grant Nexus leave to cure any identified deficiencies in its [First Amended Complaint]." D.I. 13 at 13. Although the operative complaint before the Court is an amended complaint, the original complaint did not have claims dismissed under Rule 12(b)(6). The original complaint was filed on September 21, 2022, and only included allegations regarding the '369 patent. D.I. 1. The '752 patent issued on October 11, 2022, and, on that same day, Nexus filed an Amended Complaint alleging that Exela infringes both the '369 and '752 patents. D.I. 5. Leave to file an amended complaint should be freely granted "when justice so requires." FED. R. CIV. P. 15(a)(2). Because this is the first instance that this Court has found Nexus' allegations deficient, this Court will grant Nexus leave to file a second amended complaint.

---

[2] In its brief, Nexus relies heavily on *Disc Disease Solutions Inc. v. VGH Solutions, Inc.*, 888 F.3d 1256 (Fed. Cir. 2018) to support is argument that its First Amended Complaint (D.I. 5) sufficiently meets the pleading standard. *See* D.I. 13 at 7-8, 9-11. In *Disc*, the Federal Circuit provided guidance regarding the pleading standards for "simple technology." *Id.* at 1260. The Court held the complaint at issue met "the plausibility standard of *Iqbal/Twombly*" because the complaint identified the accused product, attached photos of the product packaging as exhibits, and alleged that the accused products meet each and every element of at least one claim of the asserted patents. *Id.* The Court concluded that these disclosures and allegations were sufficient to provide the defendant "fair notice of infringement of the asserted patents." *Id.* The facts here are distinguishable. The asserted patents do not encompass simple technology, Nexus did not attach photos to its First Amended Complaint, and, as discussed above, the disclosures and allegations in the First Amended Complaint do not provide Exela fair notice of infringement of the asserted patents.

## III. CONCLUSION

For the foregoing reasons, Exela's Motion is granted without prejudice.

***

WHEREFORE, at Wilmington this 13th day of June, 2023, **IT IS HEREBY ORDERED** that:

1. Exela's Motion to Dismiss Plaintiff Nexus' First Amended Complaint for Failure to State a Claim (D.I. 7) is **GRANTED** without prejudice.
2. Nexus shall have twenty-one (21) days to file a second amended complaint to cure the deficiencies set forth in this Memorandum Order.

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ROCHE DIABETES CARE, INC.,<br><br>Plaintiff,<br>Counterclaim-Defendant,<br><br>v.<br><br>TRIVIDIA HEALTH, INC.,<br><br>Defendant,<br>Counterclaim-Plaintiff. | C.A. No. 24-668-GBW<br><br>**UNSEALED ON** 2/26/25 |

Daniel M. Silver, Alexandra M. Joyce, MCCARTER & ENGLISH, LLP, Wilmington, DE; Robert J. Gunther, Jr., Omar A. Khan, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, NY; S. Dennis Wang, WILMER CUTLER PICKERING HALE AND DORR LLP, Palo Alto, CA; David P. Yin, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, DC.

*Counsel for Plaintiff / Counterclaim-Defendant*

Benjamin J. Schladweiler, Renée Mosley Delcollo, GREENBERG TRAURIG, LLP, Wilmington, DE; Herbert H. Finn, GREENBERG TRAURIG, LLP, Chicago, IL.

*Counsel for Defendant / Counterclaim-Plaintiff*

**MEMORANDUM OPINION**

February 7, 2025
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Pending before the Court is Roche Diabetes Care, Inc.'s ("Roche") Motion to Dismiss Counterclaims and to Strike Affirmative Defenses ("Motion") (D.I. 16), which has been fully briefed (D.I. 17; D.I. 18; D.I. 21). For the reasons described below, the Court grants-in-part and denies-in-part Roche's Motion.

Also pending before the Court is Roche's motion and corresponding letter brief requesting "a stay of discovery with respect to Trividia's counterclaims, pending the resolution of Roche's Motion to Dismiss Counterclaims (D.I. 16, 17, 21); or, in the alternative, to bifurcate and stay discovery on the counterclaims" ("Stay Motion") (D.I. 53), which has also been fully briefed (D.I. 54). For the reasons described below, the Court denies Roche's Stay Motion.

## I. BACKGROUND

On June 4, 2024, Roche filed a complaint for patent infringement. D.I. 1. On July 26, 2024, Trividia Health, Inc. ("Trividia") filed its Answer to Complaint, Affirmative Defenses, and Counterclaims ("Answer and Counterclaims"). D.I. 13. Therein, Trividia alleges that Roche infringes independent claims 1 and 18 of U.S. Patent No. 8,128,981 ("the '981 patent") and independent claims 11 and 26 of U.S. Patent No. 6,964,871 ("the '871 patent") (together, the "Asserted Claims" and "Asserted Patents"). D.I. 13 at 36-43.

The Asserted Patents generally "cover technology related to Trividia's blood glucose meter and test strip product lines." *See* D.I. 18 at 2. Specifically, the '981 patent "is generally directed to 'electrochemical biosensors, and more particularly, to methods and systems for manufacturing biosensors.'" D.I. 18 at 2 (citing '981 patent at 1:12-14). The '871 patent "is generally directed

to 'electrochemical sensors and, more particularly, to systems and methods for sensing blood glucose levels electrochemically.'" D.I. 18 at 3 (citing '871 patent at 1:23-25).

On August 16, 2024, Roche filed the motion at issue here. D.I. 16. Therein, Roche contends that:

A. Trividia fails to state a claim for infringement of the '981 and '871 patents;

B. Trividia fails to state a claim for relief for the '871 patent;

C. Trividia fails to sufficiently plead knowledge required for willful and indirect infringement;

D. Trividia fails to sufficiently plead inequitable conduct; and

E. Trividia fails to sufficiently plead the equitable defenses of waiver, estoppel, and prosecution laches.

D.I. 17. Trividia opposes on each account and also, in the alternative, requests leave to amend if necessary. D.I. 18. On January 10, 2025, Roche filed its Stay Motion and corresponding letter brief; on January 14, 2025, Trividia filed its opposing letter brief. D.I. 53; D.I. 54.

## II. JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1400(b).

## III. LEGAL STANDARDS

### A. Rule 12(b)(6) Motion to Dismiss

"Courts use the same standard in ruling on a motion to dismiss a counterclaim under Rule 12(b)(6) as they do in assessing a claim in a complaint." *Zadro Prods., Inc. v. SDI Techs., Inc.*, No. 17-cv-1406-WCB, 2019 WL 1100470, at *1 (D. Del. Mar. 8, 2019) (quoting *Princeton Digital Image Corp. v. Konami Digital Entm't Inc.*, No. 12-cv-1461-LPS-CJB, 2017 WL 239326, at *3 (D. Del. Jan. 19, 2017)).

Federal Rule of Civil Procedure 8(a) requires that pleadings contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "If pleadings fail to state a claim, in whole or in part, on which a court may grant relief, a defendant may seek to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6)." *Staton Techiya, LLC v. Harman Int'l Indus.*, 734 F. Supp. 3d 354, 363 (D. Del. 2024) (citing Fed. R. Civ. P. 12(b)(6)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "In other words, a plausible claim must do more than merely allege entitlement to relief; it must support the grounds for that entitlement with sufficient factual content." *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1352 (Fed. Cir. 2021) (citing *Iqbal*, 556 U.S. 662, 678). The Court assumes the factual allegations contained in the complaint to be true and draws all reasonable inferences in favor of the non-moving party when considering a motion to dismiss. *See Twombly*, 550 U.S. 544, 555-56. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. 662, 678.

The *Iqbal/Twombly* standards govern the pleading standard for allegations of patent infringement. *Golden v. Apple Inc.*, 819 F. App'x 930, 930-31 (Fed. Cir. 2020). "Accordingly, a plaintiff cannot assert a plausible claim for infringement under the *Iqbal/Twombly* standard by reciting the claim elements and merely concluding that the accused product has those elements."

*Bot M8*, 4 F.4th 1342, 1353. Instead, "[t]here must be some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim." *Id.*

"More particularly: '[a] plaintiff is not required to plead infringement on an element-by-element basis." *AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27, 35 (Fed. Cir. 2024) (quoting *Bot M8*, 4 F.4th 1342, 1352). "Instead, it is enough that a complaint place the alleged infringer on notice of what activity . . . is being accused of infringement." *Id.* (quoting *Bot M8*, 4 F.4th 1342, 1352). "[W]hile a patentee's pleading obligations are not insurmountable, a patentee may subject its claims to early dismissal by pleading facts that are inconsistent with the requirements of its claims." *Id.* (citing *Bot M8*, 4 F.4th 1342, 1346).

**B. Rule 12(f) Motion to Strike**

Pursuant to Federal Rule of Civil Procedure 12(f), a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). In doing so, "[t]he court may act: (1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading." *Id.* "Motions to strike are generally disfavored." *Carson v. HP Inc.*, No. 22-cv-208-CJB, 2024 U.S. Dist. LEXIS 174372, at *66-67 (D. Del. Sep. 26, 2024) (citing *Symbol Techs., Inc. v. Aruba Networks, Inc.*, 609 F. Supp. 2d 353, 356 (D. Del. 2009)).

**C. Motion to Stay**

Courts have "discretionary authority to grant a motion to stay." *Kaavo Inc. v. Cognizant Tech. Sols. Corp.*, No. 14-cv-1192-LPS-CJB, 2015 WL 1737476, at *1 (D. Del. Apr. 9, 2015) (citing *Cost Bros., Inc. v. Travelers Indent. Co.*, 760 F.2d 58, 60-61 (3d Cir.1985)). "This Court has typically considered three factors when deciding a motion to stay: (1) whether granting the stay will simplify the issues for trial; (2) the status of the litigation, particularly whether discovery

is complete and a trial date has been set; and (3) whether a stay would cause the non-movant to suffer undue prejudice from any delay, or allow the movant to gain a clear tactical advantage." *Id.*

## IV. DISCUSSION

This Discussion includes the following Sections: (A) Trividia States a Claim of Infringement of the '981 Patent But Fails to State a Claim of Infringement of the '871 Patent as a Matter of Law; (B) Trividia Fails to State a Claim for Relief for the '871 Patent as a Matter of Law; (C) Trividia Fails to Sufficiently Allege Knowledge of Willful and Indirect Infringement as a Matter of Law; (D) Trividia Fails to Sufficiently Allege Inequitable Conduct as a Matter of Law; (E) Trividia Fails to Adequately Assert the Affirmative Defenses of Waiver, Equitable Estoppel, and Prosecution Laches as a Matter of Law; (F) The Court Grants Trividia's Request to Amend; and (G) The Court Denies Roche's Stay Motion.

### A. Trividia States a Claim of Infringement of the '981 Patent But Fails to State a Claim of Infringement of the '871 Patent as a Matter of Law

In its Answer and Counterclaims, Trividia, with respect to both of the Asserted Patents: (1) alleges infringement, (2) identifies allegedly infringing products, (3) recites the limitations of the Asserted Claims, (4) alleges, upon information and belief, that these limitations are satisfied, (5) includes an illustration of "representative" infringing products with annotations for certain of the limitations, and (6) alleges that these representative illustrations show that certain limitations of the Asserted Claims are satisfied. D.I. 13 at 34-43; *see* D.I. 18 (asserting that the imagery comes from a "user guide").

Trividia satisfies the pleading standard for its counterclaim that Roche infringes the '981 patent. Trividia did not "merely allege entitlement to relief." *See Bot M8*, 4 F.4th 1342, 1352. Instead, Trividia supported "the grounds for that entitlement with sufficient factual content," i.e., the illustrations of a representative infringing product with annotations for key limitations. *See*

*id.*; *see also* D.I. 13 at 39. While the illustrations did not comprise annotations for each limitation, the illustrations (for the '981 patent) provided sufficient factual detail to allow the Court "to draw the reasonable inference that [Roche] is liable for the misconduct alleged." *Ashcroft*, 556 U.S. 662, 678 (citation omitted); *compare* D.I. 13 at 39, *with* '981 patent claims 1 and 18; *see also Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018) ("The district court determined that Disc Disease failed to 'explain how Defendants' products infringe on any of Plaintiff's claims' because it 'merely alleges that certain of Defendants' products 'meet each and every element of at least one claim' of Plaintiff's patents.' We disagree. Disc Disease's allegations are sufficient under the plausibility standard of *Iqbal/Twombly*. This case involves a simple technology. The asserted patents, which were attached to the complaint, consist of only four independent claims. The complaint specifically identified the three accused products—by name and by attaching photos of the product packaging as exhibits—and alleged that the accused products meet 'each and every element of at least one claim of the '113 [or '509] Patent, either literally or equivalently.' These disclosures and allegations are enough to provide VGH Solutions fair notice of infringement of the asserted patents." (citations omitted)).

Roche's arguments to the contrary are unavailing. *First*, Roche complains that Trividia's illustrations for the '981 patent fail to address each limitation in claims 1 and 18. D.I. 17 at 6. However, Trividia was "not required to plead infringement on an element-by-element basis." *AlexSam, Inc.*, 119 F.4th 27, 35 (quoting *Bot M8*, 4 F.4th 1342, 1352). Instead, it was enough that Trividia placed Roche on notice of what activity "is being accused of infringement." *Id.* (quoting *Bot M8*, 4 F.4th 1342, 1352).

Moreover, as Trividia observes, since "details regarding allegedly infringing methods are primarily in the accused infringer's" possession, "courts have routinely found that infringement

allegations brought 'upon information and belief' are sufficient to satisfy the pleading standard when they pertain to accused methods or processes of manufacture." D.I. 18 at 10; *see, e.g.*, *DermaFocus LLC v. Ulthera, Inc.*, 201 F. Supp. 3d 465, 469 n.7 (D. Del. 2016) ("And, indeed, it may not be possible for a plaintiff to describe its case-in-chief with particularity at the outset of litigation, without access to the accused method, the accused apparatus for reverse engineering, or confidential data such as source code."); *DSM IP Assets, B.V. v. Honeywell Int'l, Inc.*, 700 F. Supp. 3d 189, 197 (D. Del. 2023) ("The use of 'information and belief' pleading in the complaint is consistent with the purposes previously approved by the Third Circuit and other courts. The 'information and belief' allegations relate to limitations that address the process for manufacturing the accused products, information to which DSM is not privy, or details regarding the composition of Honeywell's products that may be difficult to ascertain by testing the finished products, but which would be readily known to the manufacturer. Those allegations are therefore made in circumstances in which the factual information in question is peculiarly within the defendant's knowledge or control."); *NNCrystal US Corp. v. Nanosys, Inc.*, No. 19-cv-1307-RGA, 2020 WL 616307, at *3 (D. Del. Feb. 10, 2020) ("I find that the pertinent facts pled on information and belief here are within Defendant's knowledge and control, as they relate to processes performed by Defendant. I will not dismiss Plaintiff's First Amended Complaint [regarding patent infringement] on this basis." (citation omitted)).[1]

*Second*, Roche contends that as to some limitations of claims 1 and 18 of the '981 patent, Trividia "merely recites the claim language verbatim and adds a conclusory allegation that 'the

[1] Roche contends that a legal theory of infringement requires factual allegations to support plausibility even when some of the allegations regarding the manufacturing processes at issue are brought upon information and belief. D.I. 21 at 3. Roche is correct. With its annotated illustrations, however, Trividia's theory that Roche infringed the '981 patent is plausible.

representative Accu-Chek® Test Strip is formed' using those limitations." D.I. 17 at 7. Roche also contends that "Trividia's '981 patent counterclaim is particularly problematic because it fails to plead any factual allegations for key claim limitations material to patentability." D.I. 17 at 8. In particular, Roche contends: "Here, Trividia fails to allege any facts regarding the 'movement' limitations—the purported point of novelty to obtain issuance of the patent." D.I. 17 at 8. However, as stated above, Trividia was "not required to plead infringement on an element-by-element basis." *AlexSam, Inc.*, 119 F.4th 27, 35 (quoting *Bot M8*, 4 F.4th 1342, 1352). In addition, as described above, information regarding "limitations that address the process for manufacturing the accused products" may not be readily available to Trividia. *See DSM IP Assets*, 700 F. Supp. 3d 189, 197.

*Third*, Roche contends: "Trividia's conclusory allegations are even more even more [sic] general and conclusory than allegations that courts have held to be insufficient under *Iqbal* and *Twombly*." D.I. 17 at 8. Roche first cites *Staton Techiya, LLC v. Harman Int'l Indus., Inc.*, 734 F. Supp. 3d 354, 376 (D. Del. 2024) in support. D.I. 17 at 8-9. In *Staton Techiya*, this Court explained: "The claim recites that the processor 'calculates a value, using a first signal and a second signal,' but the Complaint is unclear as to whether the microphones generate the second signal because it pleads only a singular 'signal,' and it is unclear how many test signals are present because there is more than one microphone alleged in the Complaint." *Staton Techiya*, 734 F. Supp. 3d 354, 376-77. The Answer and Counterclaims here, however, do not allege "only a singular" component with respect to any limitation that requires multiple components. *Compare* D.I. 13, *with* '981 patent claims 1 and 18.

Roche's out-of-circuit case (*see* D.I. 17 at 9) is not binding on this Court. *See Wahl Clipper Corp. v. Conair Corp. & Conair LLC*, No. 23-cv-00114-JCG-LDH, 2024 U.S. Dist. LEXIS 23526,

at *2 (D. Del. Jan. 16, 2024) (confirming that out-of-circuit cases "are not binding on this Court"); *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 395 (3d Cir. 2017) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same [district] judge in a different case." (alteration in original) (quoting *Camreta v. Greene*, 563 U.S. 692, 709 (2011))).

Separately, Roche contends: "Trividia's failure to state a counterclaim of direct infringement of the '981 patent also dooms Trividia's counterclaim for willful and indirect infringement of the '981 patent." D.I. 17 at 9. Roche contends further: "Trividia's barebones allegations under the doctrine of equivalents should be dismissed for the same reason." D.I. 17 at 9. However, since Trividia adequately plead a claim for direct infringement of the '981 patent, Trividia's claims for willful and indirect infringement, and also its allegations under the doctrine of equivalents, are not "doom[ed]." *See* D.I. 17 at 9; *see also Metrom Rail, LLC v. Siemens Mobility, Inc.*, No. 22-cv-49-RGA, 2023 WL 2598775, at *1 (D. Del. Mar. 22, 2023) (holding that "[b]oilerplate invocations of the doctrine of equivalents as an alternative to literal infringement are sufficient" where the allegations of literal infringement are sufficient).

In its Reply, Roche emphatically re-asserts that "Trividia incorrectly contends that it was not required to plead factual allegations for 'each and every' limitation for an asserted claim." D.I. 21 at 1. Roche cites five cases for the proposition that "[t]o adequately plead direct infringement, a plaintiff needs to plead facts that plausibly indicate that the accused products contain each of the limitations found in the claim." D.I. 21 at 1-2. These cases appear to correctly state the law. However, Roche conflates pleading factual allegations for each and every limitation (which is not required, as provided in *Bot M8*) with pleading facts that plausibly indicate that the accused product

contains each and every limitation (which is required). Here, Trividia satisfies the latter with respect to the '981 patent.

Roche also asserts that "Trividia's reliance on *Bot M8* is misplaced." D.I. 21 at 2. In particular, Roche contends that *Bot M8*'s holding that a "plaintiff is not required to plead infringement on an element-by-element basis" (*see Bot M8*, 4 F.4th 1342, 1352) "means that the specific form of 'plead[ing] infringement on an element-by-element basis'—e.g., with claim charts—is not required" (D.I. 21 at 2). However, the Federal Circuit did not cabin its "element-by-element" rule to a specific form (like charts) and neither will this Court.

While Trividia adequately pleads infringement of the '981 patent, Trividia fails to adequately plead infringement for the '871 patent. Unlike the illustrations for the '981 patent, the illustrations and corresponding annotations for the '871 patent fail to provide sufficient factual detail to allow the Court "to draw the reasonable inference that [Roche] is liable for the misconduct alleged." *See Ashcroft*, 556 U.S. 662, 678 (citation omitted). While Trividia was not required to plead infringement on an element-by-element basis, Trividia eschewed factual presentation of the majority of the claim limitations, including several claim limitations that do not appear to be exclusively within Roche's knowledge.

For example, while claim 11 of the '871 patent requires "at least four electrodes, disposed on said first substrate, for measuring at least one electrical characteristic of said blood sample in said testing zone, said at least four electrodes including a working electrode, a counter electrode, a fill-detect anode, and a fill-detect cathode," Trividia's Answer and Counterclaims merely annotates a "four electrode pattern" without identifying the electrodes. D.I. 13 at 41-42. As Roche observes (D.I. 21 at 3), the Federal Circuit affirmed dismissal in a similar context. *Bot M8*, 4 F.4th

1342, 1355 ("While Bot M8 points to different storage components in the allegedly infringing devices, it never says which one or ones satisfy the mutual authentication limitation.").

In light of the Court's holdings, the Court does not address each contention raised by the parties.[2]

**B. Trividia Fails to State a Claim for Relief for the '871 Patent as a Matter of Law**

"Pursuant to 35 U.S.C. § 287(a), a patentee who makes or sells a patented article must mark his articles or notify infringers of his patent in order to recover damages." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1365 (Fed. Cir. 2017). 35 U.S.C. § 287(a) provides:

> Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or by fixing thereon the word "patent" or the abbreviation "pat." together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, *except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice*. Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287(a) (emphasis added). "The patentee bears the burden of pleading and proving he complied with § 287(a)'s marking requirement." *Arctic Cat Inc.*, 876 F.3d 1350, 1365.[3]

---

[2] For example, the parties dispute whether the Motion and pleadings gave rise to a claim construction dispute. *See, e.g.*, D.I. 18 at 9-10.

[3] "The Federal Circuit has held that pleading infringement to be 'willful and with full knowledge' is sufficient to plead constructive notice of compliance with the marking statute." *Realtime Data LLC v. EchoStar Corp.*, No. 17-cv-00084-JDL, 2018 WL 11364376, at *3 (E.D. Tex. Oct. 16, 2018) (citing *Sentry Prot. Prods., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 918 (Fed. Cir. 2005)); *see*

Here, Roche contends: "Trividia's counterclaims neither pleaded that Roche had actual notice of infringement before November 1, 2022 [i.e., the expiration of the '871 patent], nor that Trividia complied with the marking statute by alleging that it marked patented articles before November 1, 2022 or that it lacked any articles to mark." D.I. 17 at 12-13.

In response, Trividia contends that "'it is sufficient to allege that the accused infringer had knowledge of the asserted patents' to adequately raise the issue of pre-suit damages" (D.I. 18 at 12 (quoting *FO2GO LLC v. KeepItSafe, Inc.*, 2019 WL 1615398, at *4 (D. Del. Apr. 16, 2019))) and that Trividia's Answer and Counterclaims was sufficient because it alleged "that '*[r]egardless of any earlier knowledge*, on October 16, 2023, counsel for Trividia engaged in a video conference with representatives of Roche during which the '981 patent and the '871 patent were identified to Roche as being infringed' and that, by that time, Roche had actual knowledge of the '871 patent" (D.I. 18 at 12 (citing D.I. 13 ¶ 20)).

Here, regardless of whether the knowledge of an accused infringer is sufficient, Trividia's allegation of *potential* knowledge without *any* specification as to timing (and as a preface to a different allegation) lacks "facial plausibility" that would allow the Court "to draw the reasonable inference that [Roche] is liable for the misconduct alleged." *See Ashcroft*, 556 U.S. 662, 678. As such, Trividia fails to state a claim for relief for the '871 patent as a matter of law.[4]

---

*Cordance Corp. v. Amazon.com, Inc.*, 631 F. Supp. 2d 484, 499 (D. Del. 2009). However, as discussed *infra* § IV(c), Trividia fails to adequately allege willful infringement.

[4] Trividia's argument that it was not required to "comply with the marking statute" as "to the asserted method claim" (D.I. 18 at 12) of the '871 patent is misleading. With respect to the '981 patent, Trividia asserts two methods claims (i.e., claims 1 and 18). Thus, Trividia was not required to plead compliance with the marking statute with respect to the '981 patent. *See Sapphire Crossing LLC v. Robinhood Mkts., Inc.*, 2021 WL 149023, at *7 (D. Del. Jan. 15, 2021) ("[I]n a case where a plaintiff is *only* asserting method claims of a patent that includes both method and apparatus claims, the marking statute does not apply." (emphasis added)). Perhaps for this reason, Roche did not raise the '981 patent in its motion. However, with respect to the '871 patent, Trividia

### C. Trividia Fails to Sufficiently Allege Knowledge of Willful and Indirect Infringement as a Matter of Law

"Claims for induced, contributory and willful infringement all require that the defendant had knowledge of the patents-in-suit and knowledge that the acts at issue constituted patent infringement." *Bench Walk Lighting LLC v. LG Innotek Co.*, 530 F. Supp. 3d 468, 491 (D. Del. 2021).

The parties cite competing fact patterns exemplifying, or not exemplifying, pleadings alleging the requisite level of knowledge. Roche, for example, cites *Cleveland Medical Devices Inc. v. ResMed Inc.* (D.I. 17 at 14), which held that the plaintiff had "not adequately pled" that the defendant "had pre-suit knowledge of infringement" because "[n]owhere [did] [plaintiff] allege that its correspondence with [defendant] identified [defendant's] accused products, identified [plaintiff's] asserted patent and claims allegedly infringed, and explained why [defendant's] accused products or components read on the claims' limitations." No. 22-cv-794-GBW, 2023 WL 6389628, at *5 (D. Del. Oct. 2, 2023).

Roche also cites *Bench Walk Lighting* (D.I. 17 at 14) which held: "With regard to the notice letter, nowhere in its answering brief did Plaintiff make any argument as to why the content of that letter sufficed to establish the requisite pre-suit knowledge [and thus] Plaintiff necessarily conceded that the letter cannot do so." 530 F. Supp. 3d 468, 492.

---

asserts one apparatus claim (i.e., claim 11) and one method claim (i.e., claim 26). Therefore, Trividia was required to plead compliance with the marking statute with respect to the '871 patent. *See Am. Med. Sys. v. Med. Eng'g*, 6 F.3d 1523, 1538-39 (Fed. Cir. 1993) ("The purpose behind the marking statute is to encourage the patentee to give notice to the public of the patent. The reason that the marking statute does not apply to method claims is that, ordinarily, where the patent claims are directed to only a method or process there is nothing to mark. Where the patent contains both apparatus and method claims, however, to the extent that there is a tangible item to mark by which notice of the asserted method claims can be given, a party is obliged to do so if it intends to avail itself of the constructive notice provisions of section 287(a).").

Trividia, on the other hand, cites *VideoLabs, Inc. v. Netflix, Inc.* (D.I. 18 at 13), which found knowledge sufficiently plead where the complaint alleged, among other things, that the patent holder sent the following information to the alleged infringer:

> [A]lthough we are continuing to analyze Netflix's streaming service globally, we can confirm that we have acquired many patents relevant to Netflix and would still like to discuss some options for how Netflix can license these patents. . . . Some examples of patents that we have confirmed are used by Netflix and provide it substantial value include:
>
> - U.S. Patent No. 8,139,878: used by Netflix to encode its content with H.264 CAVLC entropy encoding;
> - U.S. Patent No. 7,440,559: used by Netflix to control the flow of its video content to customers, such as with Netflix's Bookmarking, Smart Downloads, Skip Intro/Recap, and Autoplay features;
> - U.S. Patent No. 7,233,790: used by Netflix to present its video content catalogue to customers using a wide variety of devices.

No. 22-cv-229, 2024 WL 2153274, at *10-11 (D. Del. May 14, 2024).

Trividia also cites *VideoLabs, Inc. v. Meta Platforms, Inc.* in support of its argument. D.I. 18 at 13 (citing 730 F. Supp. 3d 111, 127 (D. Del. 2024) ("Here, Plaintiffs adequately pled claims of willful and indirect infringement. The Complaint alleges that VideoLab and Meta representatives spoke to each other on a number of occasions. On January 30, 2020, the parties met in person and VideoLab representatives presented Meta with a proposal to license VideoLab's platform. The Complaint continues to describe additional conversations between the parties. Importantly, Plaintiffs allege that their representatives reached out to Defendants and state 'with regards to Facebook, and based on our analysis so far, we have determined that VideoLabs' current patent portfolio is relevant to the majority of Defendants' annual revenue in some way and we have 17 unique claim charts completed or in development related to Defendants' backend infrastructure.' The Complaint also avers that Plaintiffs' sent a letter to Defendants regarding their

alleged infringement. These allegations, viewed in the light most favorable to Plaintiffs at this stage of the litigation, plausibly show that Defendants had pre-suit knowledge and for this reason the claims of indirect and willful infringement are sufficiently pled." (cleaned up))).

Trividia also cites *Election Systems & Software, LLC v. Smartmatic USA Corp.* in support of its argument. D.I. 18 at 13 (citing No.18-cv-1259-RGA, 2019 WL 1040541, at *2 (D. Del. Mar. 5, 2019) ("Plaintiff's complaint alleges that Plaintiff gave Defendant notice of its infringement of the patents-in-suit on February 23, 2018. After this notice, Defendant submitted a proposal offering to sell an accused infringing product. On July 19, 2018, Plaintiff sent a letter to Defendant, informing Defendant that the ballot marking device it offered for sale infringed the patents-in-suit. Defendant has continued with the VSAP proposal and development of a ballot marking device for Los Angeles County. On these facts, it is plausible that Defendant intentionally or knowingly infringed the patent-in-suit. Plaintiff has therefore sufficiently alleged that Defendant willfully infringed." (cleaned up))).

Here, Roche's and Trividia's cases confirm that Trividia failed to sufficiently allege Roche's knowledge for the purpose of willful and indirect infringement. Like the plaintiff in *Cleveland Medical Devices*, for example, Trividia did not adequately plead that Roche "had pre-suit knowledge of infringement" because "[n]owhere does [Trividia] allege that its correspondence with [Roche] identified [Roche's] accused products, identified [Trividia's] asserted patent and claims allegedly infringed, and explained why [Roche's] accused products or components read on the claims' limitations." *See* 2023 WL 6389628, at *5. Similarly, unlike the plaintiff in *VideoLabs, Inc. v. Netflix, Inc.*, Trividia did not allege that, in the video conference with Roche, Trividia described *how* Roche violated the Asserted Patents. *See* 730 F. Supp. 3d 111, 127 (observing that the patent holder made allegations describing as much); *see also Election Sys. &*

*Software*, 2019 WL 1040541, at *2 (acknowledging that the plaintiff, unlike here, identified a specific allegedly infringing product, i.e., the ballot marking device).

Trividia also asserts: "In response to a demand from Roche, the parties entered into a Confidential Disclosure Agreement (CDA) restricting disclosure of certain information discussed in the video conference causing difficulties in presenting further details at this time." D.I. 18 at 14 n.6. As described below, the Court will grant Trividia's request to file amended counterclaims. In light of the parties' Confidential Disclosure Agreement, Trividia may request to file its amended counterclaims under seal.

Finally, the parties debate whether post-suit indirect and willful infringement can be based on knowledge obtained from the filing of Trividia's Answer and Counterclaims. *See* D.I. 17 at 15-16; D.I. 18 at 14-15. Absent instruction to the contrary from the Federal Circuit or U.S. Supreme Court, the Court adopts Trividia's position, such that post-suit indirect and willful infringement can be based on knowledge obtained from the filing of Trividia's Answer and Counterclaims. *See DSM IP Assets*, 700 F. Supp. 3d 189, 199-203 ("Judges in this district have on several occasions addressed the question whether knowledge of a patent gained as of the time of the infringement complaint can serve as knowledge of the patent for purposes of proving indirect infringement. . . . I will follow the majority rule as adopted in *SoftView* and *IOENGINE*. Based on that authority, I reject Honeywell's suggestion in its brief that a claim of post-suit indirect infringement cannot be based on knowledge obtained from the complaint that initiated the lawsuit. . . . As in the case of indirect infringement, courts are divided as to whether allegations of willfulness are sufficient to withstand a motion to dismiss when the element of knowledge of the patent is based on the filing of the complaint in the case in which willfulness is alleged. Again, a majority of courts that have addressed that issue have held that a charge of post-filing willfulness

can properly be predicated on knowledge of the patent as a result of the filing of either the original complaint or an amended complaint. I agree with that line of cases, and for the reasons stated above, Honeywell's motion to dismiss DSM's willfulness allegations is denied, except as to claim 8, as discussed in footnote 3, above." (citations omitted)).

**D. Trividia Fails to Sufficiently Allege Inequitable Conduct as a Matter of Law**

Roche contends: "Trividia's inequitable conduct counterclaim and affirmative defense are fatally deficient." D.I. 17 at 16. Roche is correct. Trividia's Answer and Counterclaims "fails to identify which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found—i.e., the 'what' and 'where' of the material omissions." *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1329 (Fed. Cir. 2009); *see also Allergan USA, Inc. v. Prollenium US Inc.*, No. 19-cv-126-CFC-SRF, 2019 U.S. Dist. LEXIS 222245, at *6 (D. Del. Dec. 30, 2019) ("Affirmative defenses for inequitable conduct are subject to the heightened pleading standard of Rule 9(b)."); *IBM v. Priceline Grp., Inc.*, No. 15-cv-137-LPS-CJB, 2017 U.S. Dist. LEXIS 54285, at *13 (D. Del. Apr. 10, 2017) (confirming that a "counterclaim and affirmative defense for inequitable conduct rise and fall together"). As such, Trividia fails to sufficiently allege the counterclaim and affirmative defense of inequitable conduct. *See id.* In light of the Court's holding, the Court does not address each contention raised by the parties.[5]

[5] For example, the parties dispute whether Trividia adequately plead the "who" and "scienter" requirements of inequitable conduct. *See, e.g.*, D.I. 21 at 8. Insofar as there are additional shortcomings in Trividia's Answer and Counterclaims, and insofar as Trividia files amended counterclaims that include counterclaim(s) for inequitable conduct, Trividia should strive to sufficiently remedy these shortcomings to mitigate additional motion practice.

**E. Trividia Fails to Adequately Assert the Affirmative Defenses of Waiver, Equitable Estoppel, and Prosecution Laches as a Matter of Law**

Roche contends: "Trividia's affirmative defenses of waiver, equitable estoppel and prosecution laches fail to provide any notice of the factual bases for those defenses and thus should be dismissed." D.I. 17 at 18. Trividia disagrees and, in doing so, cites *Boston Scientific Corp. v. Edwards Lifesciences Corp.*, No. 16-cv-275-SLR-SRF, 2017 WL 781046, at *2 (D. Del. Feb. 28, 2017). D.I. 18 at 18. *Boston Scientific* confirms that due "to the differences between Rules 8(a) and 8(c) in text and purpose, *Twombly* and *Iqbal* do not apply to affirmative defenses, which need not be plausible to survive," and that rather, an affirmative defense generally "must merely provide fair notice of the issue involved." 2017 WL 781046, at *2.

However, Trividia ignores that, as an exception to this rule, "the equitable affirmative defenses of waiver [and] estoppel . . . must be plead with particularity under Rule 9(b)" (like the affirmative defense of inequitable conduct discussed in the previous Section). *Bench Walk Lighting LLC v. Everlight Elecs. Co.*, No. 20-cv-49-RGA, 2020 WL 5128086, at *1 (D. Del. Aug. 31, 2020) (striking equitable estoppel and waiver defenses because defendant failed to plead sufficient facts under Rule 9(b)); *Bayer CropScience AG v. Dow AgroSciences LLC*, 2011 WL 6934557, at *3 (D. Del. Dec. 30, 2011) (striking equitable estoppel defense because plaintiff "was required to plead this affirmative defense with particularity under Rule 9(b)"); *Tigo Energy Inc. v. SMA Solar Tech. Am. LLC*, 2024 WL 964203, at *3-4 (D. Del. Mar. 5, 2024) (striking equitable defenses of "equitable estoppel" and "waiver" because plaintiff "failed to plead each defense with the requisite particularity under Rule 9(b)").

Here, Trividia merely asserts that Roche's "claims are barred in whole or in part by the doctrines of waiver [and] estoppel." D.I. 13 at 29. Lacking particularity, the Court strikes Trividia's affirmative defenses of waiver and estoppel without prejudice.[6]

As to prosecution laches, an "assertion of prosecution latches" that "is limited to a one sentence conclusory statement, containing no information to support the elements of unreasonable and inexcusable delay" is insufficient and subject to a motion to strike. *Sonos, Inc. v. D&M Holdings Inc.*, No.14-cv-1330-RGA-MPT, 2016 WL 4249493, at *7 (D. Del. Aug. 10, 2016), *report and recommendation adopted*, No. 14-cv-1330-RGA, 2016 WL 4581078 (D. Del. Sept. 1, 2016); *see Allergan Holdings Unlimited Co. v. MSN Lab'ys Priv. Ltd.*, No. 23-cv-794-RGA, 2024 WL 3444368, at *4 (D. Del. July 17, 2024) (striking prosecution laches defense for failure to plead how defendant "face[d] any prejudice as a result of [the patentee's] delay").

Here, Trividia perfunctorily alleges: "Plaintiff's claims are barred in whole or in part by the doctrine of prosecution laches because of an inequitable scheme to extend patent rights including, among other things, an unreasonable delay in prosecuting the asserted claims under the facts presented here." D.I. 13 at 30. Like the assertion in *Sonos*, Trividia's "assertion of prosecution latches" here "is limited to a one sentence conclusory statement, containing no information to support the elements of unreasonable and inexcusable delay." *See Sonos, Inc.*, 2016 WL 4249493, at *7. Lacking sufficiency, the Court strikes Trividia's affirmative defense of prosecution latches without prejudice.

---

[6] Trividia contends that "Trividia has plead inequitable conduct with the requisite particularity." D.I. 18 at 19. The Court addresses whether Trividia sufficiently plead inequitable conduct *supra* § IV(D).

**F. The Court Grants Trividia's Request to Amend**

Federal Rule of Civil Procedure 15(a)(2) provides that "a party may amend its pleading" with "the court's leave" and that the Court "should freely give leave when justice so requires." "The Third Circuit has adopted a liberal policy favoring amendment of pleadings to ensure that claims are decided on the merits rather than on technicalities." *Mallinckrodt Inc. v. E-Z-EM Inc.*, 671 F. Supp. 2d 563, 567 (D. Del. 2009). Having considered this liberal policy and the record, the Court grants Trividia's request for leave to amend its counterclaims. Trividia's amendment may not assert any new counterclaims or affirmative defenses; rather, it may only correct the pleading deficiencies in the counterclaims and affirmative defenses already asserted.

**G. The Court Denies Roche's Stay Motion**

As stated above, also pending before the Court is Roche's Stay Motion requesting either (1) "a stay of discovery with respect to Trividia's counterclaims, pending the resolution of Roche's Motion to Dismiss Counterclaims (D.I. 16, 17, 21)," or, in the alternative, (2) "to bifurcate and stay discovery on the counterclaims." D.I. 53. In light of the Court's ruling on Roche's Motion, the Court denies-as-moot the first request in Roche's Stay Motion. The Court, in the exercise of its discretion and upon review of the record and the parties' letter briefing (D.I. 53; D.I. 54), also denies the second request in Roche's Stay Motion.

As described above, this Court "has discretionary authority to grant a motion to stay." *Kaavo Inc.*, 2015 WL 1737476, at *1. As both parties recognize, "[t]his Court has typically considered three factors when deciding a motion to stay: (1) whether granting the stay will simplify the issues for trial; (2) the status of the litigation, particularly whether discovery is complete and a trial date has been set; and (3) whether a stay would cause the non-movant to suffer undue prejudice from any delay, or allow the movant to gain a clear tactical advantage." *Id.*

Here, the factors do not favor a stay. Given that each party is asserting patent infringement claims against the other party (with respect to patents directed to similar technology), a stay of one of the parties' claims (or bifurcation) may, as Trividia observes, "result in duplicate efforts for the litigating [] parties" and the Court. D.I. 54 at 2. It would not simplify issues, for example, to risk separate *Markman* hearings and summary judgment hearings. *See Westinghouse Air Brake Techs. Corp. v. Siemens Mobility, Inc.*, No. 17-cv-1687-LPS-CJB, 2019 U.S. Dist. LEXIS 3704, at *4 (D. Del. Jan. 8, 2019) ("The District Court may have been even more mindful of the need to keep this case moving forward, in light of the parties' particular litigation history. The counterclaims at issue are just one front of a larger battle between Plaintiff and Defendant—a battle that spans two different civil cases in this District . . . , which also involve affirmative claims of patent infringement brought by both sides regarding a significant number of patents. It is a careful balance to keep all of these cases and issues moving forward in a just and equitable manner, and the District Court clearly felt that staying discovery as to the counterclaims pending the resolution of the motions to dismiss and sever was not the right way to strike that balance.").

Moreover, if Roche was so concerned with the purported burden or impropriety of proceeding with discovery on Trividia's counterclaims, Roche could have stipulated to Trividia's proposed global stay of discovery as to both of the parties' claims. *See* D.I. 54 at 1 ("To resolve this dispute and avoid burdening the Court, Trividia suggested a global stay of discovery. Evidencing a tactical decision, not one seeking to avoid effort and expense, Roche rejected Trividia's offer instead proceeding with the present MTS.").

In addition, while the posture of the case is relatively early, the parties (as Trividia observes) "have already devoted substantial time and resources to negotiating scheduling and protective orders, serving and responding to discovery requests, producing documents, briefing

Roche's MTD and now its MTS, and serving initial disclosures, Initial Invalidity Contentions and Initial Infringement Contentions." D.I. 54 at 2 (citations omitted).

At bottom, the Court will not stay discovery as to Trividia's counterclaims, while allowing discovery as to Roche's claims to continue, risking the unnecessary duplication of effort by the parties and also the unnecessary expenditure of the Courts' limited resources, especially where Roche has declined a global stay.

In light of *inter alia* the insufficiency of Trividia's counterclaims, however, the Court would entertain a stipulation or request for a global stay, consistent with this Memorandum Opinion and the instructions in the accompanying Order. *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1302 (Fed. Cir. 2011) (en banc) (O'Malley, J., concurring) (explaining that the "[c]areful application of the pleading requirements set forth in *Exergen*" and "orders to stay discovery" are "tools district courts can employ where appropriate" to prevent "litigation abuses" based on improper inequitable conduct claims); *see also Levey v. Brownstone Inv. Grp.*, 590 F. App'x 132, 137 (3d Cir. 2014) ("The Rule 12(b)(6) procedure streamlines litigation by dispensing with needless discovery and factfinding, and motions to dismiss filed under it should typically be resolved before discovery begins." (cleaned up)). The Court's decision is predicated on the precise facts before it.

## V. CONCLUSION

For the foregoing reasons, the Court (1) **GRANTS-IN-PART** and **DENIES-IN-PART** Roche's Motion, (2) **GRANTS** Trividia's request to amend, and (3) **DENIES** Roche's Stay Motion. An Order consistent with this Memorandum Opinion will be entered.